(155 App. Div. 294.)

STRONG v. GAMBIER et al.

(Supreme Court, Appellate Division, Second Department.   February 28, 1913.)

1. WILLS (§ 302*)—VALIDITY—ESTABLISHMENT.

In an action by one claiming as devisee under a will destroyed after the death of testatrix, evidence held sufficient to support a finding of the execution and destruction of the will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 575, 581, 700–710; Dec. Dig. § 302.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. WITNESSES (§ 159*)—COMPETENCY.

As a will is an instrument in substitution of the statutes of distribution or descent, a devisee and his wife, who claim land under a will which was destroyed after testator's death, are not incompetent, under Code Civ. Proc. § 829, providing that a party or person interested in the event shall not be examined in his own behalf or interest against the executor of a deceased person, to testify that they saw the will.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 629, 664, 666–669, 671–682; Dec. Dig. § 159.*]

3. EVIDENCE (§ 155*)—REBUTTAL EVIDENCE.

In an action by one claiming under a destroyed will, where the defendants introduced letters from the testatrix referring warmly to others of her kin, and making no reference to the plaintiff, evidence of testamentary declarations that the testatrix had willed her property to the plaintiff is admissible in rebuttal.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 445–458; Dec. Dig. § 155.*]

4. DEEDS (§ 210*)—CONSIDERATION—EVIDENCE.

In an action where it was claimed that the consideration for a deed taken in the name of testatrix was advanced by a company in which her husband was interested, evidence *held* to show that, while payments were made by that company, it was a debtor and not a creditor of the testatrix.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 635, 636; Dec. Dig. § 210.*]

5. HUSBAND AND WIFE (§ 171*)—MORTGAGE BY WIFE TO SECURE HUSBAND'S DEBTS—DISCHARGE.

Where a wife, to enable her husband to borrow money, gave him an absolute deed to be used as a mortgage, renewal loans made upon the faith of the security of the deed after the death of the wife are liens chargeable upon the land.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 671–683; Dec. Dig. § 171.*]

6. HUSBAND AND WIFE (§ 138*)—AGENCY OF HUSBAND FOR WIFE—DEATH OF WIFE.

Where a wife made her husband her agent to borrow money upon her land, her death revoked the agency.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 524–537: Dec. Dig. § 138.*]

7. HUSBAND AND WIFE (§ 138*)—AGENCY OF HUSBAND FOR WIFE—APPARENT SCOPE OF AUTHORITY.

Where a wife, to enable her husband to borrow money, gave him an absolute deed, executed in blank, the nature of the instrument apprised the lender that the wife did not intend to make a conveyance of her entire interest and conferred no apparent authority upon the husband to represent that he was the actual owner.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 524–537; Dec. Dig. § 138.*]

8. HUSBAND AND WIFE (§ 171*)—MORTGAGE BY WIFE TO SECURE HUSBAND'S DEBTS—EQUITABLE ESTOPPEL.

Where a devisee, entitled to land under the will of his aunt, with knowledge of his rights, allowed his aunt's husband to remain in possession during his lifetime, and, though an absolute deed given by the aunt to enable her husband to borrow money from a bank was recorded shortly after her death, did not warn the bank that the husband had no title,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

he was guilty of such laches as to estop him from denying the bank's lien for loans subsequently made on the faith of the deed.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 671–683; Dec. Dig. § 171.*]

9. HUSBAND AND WIFE (§ 171*)—MORTGAGE BY WIFE TO SECURE HUSBAND'S DEBTS—EVIDENCE.

In an action by a devisee under a destroyed will, evidence *held* to show that the testatrix, by the execution of a deed in blank to enable her husband to borrow money on the land in question, did not intend to divest herself of title in favor of a company in which the husband was interested, so as to give it a lien on, or title to, the property.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 671–683; Dec. Dig. § 171.*]

10. MORTGAGES (§ 32*)—ABSOLUTE DEED AS MORTGAGE.

An absolute deed in blank, intended to operate as a mortgage, does not cease to be a mortgage because the grantee holds it in trust for others.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 60–66, 84–94; Dec. Dig. § 32.*]

11. WITNESSES (§ 159*)—COMPETENCY—TRANSACTIONS WITH DECEASED PERSONS.

Under Code Civ. Proc. § 829, providing that a party cannot testify in his behalf against the executor or administrator or survivor of a deceased person, testimony by a devisee, claiming under the destroyed will of his aunt, that her husband, after showing him the will, asked him to live with them, and stated that he would be taken care of, is inadmissible as to parties who represent or claim under the husband, also deceased.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 664, 666–669, 671–682; Dec. Dig. § 159.*]

12. APPEAL AND ERROR (§ 1052*)—REVIEW—HARMLESS ERROR.

The admission of improper testimony is immaterial to a party who received all it claims.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4171–4177; Dec. Dig. § 1052.*]

13. APPEAL AND ERROR (§ 1051*)—REVIEW—HARMLESS ERROR.

Where there was competent evidence showing the same facts, the admission of incompetent testimony is harmless.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4161–4170; Dec. Dig. § 1051.*]

14. COSTS (§ 32*)—ALLOWANCE.

In an action by one claiming under a destroyed will, a bank, entitled to liens upon the land devised, is entitled to an allowance for costs, though it did not ask for affirmative relief, where the relief asked by the complaint involved the ascertainment of the amount due on the bank's mortgage, and the devisee was defeated in his efforts to show there was no lien.

[Ed. Note.—For other cases, see Costs, Cent. Dig. §§ 108–132; Dec. Dig. § 32.*]

Appeal from Special Term, Westchester County.

Action by Samuel Meredith Strong against the Merchants' Exchange National Bank, Edward B. Gambier, as trustee, and others. From the judgment, both plaintiff and defendants appeal. Modified in favor of the bank.

Argued before JENKS, P. J., and THOMAS, CARR, WOODWARD, and RICH, JJ.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

John McG. Goodale, of New York City, for plaintiff.

I. R. Oeland, of Brooklyn (Joab H. Banton, of New York City, on the brief), for defendants Merchants' Exchange National Bank and Edward V. Gambier, trustee, individually and as executor, etc.

Charles A. Boston, of New York City (Robert Burns, on the brief), for defendants Hektograph Company and Louise B. Green.

John H. McCrahon, of New York City, for heirs of Lilla Amanda Green.

George G. Reynolds, 2d, guardian ad litem for defendant Helen Gross.

THOMAS, J.  The plaintiff claiming title as devisee under a will of Lilla A. Green, destroyed after her death, seeks to have a deed of land in New Rochelle made by his testatrix adjudged a mortgage, and so it has been.  The decedent's collateral heirs joined for such relief, but unsuccessfully contended that no will was made.  The Merchants' Exchange National Bank, Gambier, individually and as executor of Charles H. Green, the husband of the testatrix, Louise B. Green, Green's second wife, and the Hektograph Company, claim interest under the deed, and all have been unsuccessful save that the bank is adjudged a lienor on the land in the sum of $8,300 for loans to Green before his first wife's death, but appeals because it was not allowed for loans made thereafter, while the plaintiff appeals because any lien was allowed.  Sanbern and the Hamilton Trust Company, as judgment creditors of Charles H. Green, assert that Charles H. Green owned the land, while Alexander, not appealing, as the only judgment creditor at the time, contended that the land was by Green's procurement placed in her hands to defeat creditors.  Before complicating the inquiry by considering the claims of defendants, who, whatever their own disagreements, unite against the plaintiff and the heirs, it is convenient to decide whether Lilla A. Green left a will destroyed after her death; for, if she did not, the relief given the plaintiff belongs to the heirs.  She died on November 9, 1905.  He died in 1908. The plaintiff was his nephew, and at the age of eight became a member of his family and was educated and supported by his uncle and aunt, who had towards him an affection measured by the relation, and indicated at least by their helpfulness, although there is some contention that Mrs. Green deprecated, if she did not resent, his marriage in 1902 to Miss Quimby, who also in July and August, 1902, visited in the family at the instance of Mrs. Green, under her own name as she proves, but under the assumed name, Riley, and as a friend of the cook Mrs. Molineaux, as plaintiff's opponents would prove but did not.  The plaintiff remained an actual member of the family till 1902, when he went to New Mexico, where he resided until 1906, when he returned to the city of New York.

[1] The will was executed in 1901.  Kate Molineaux, the cook for seven years with the family in New York, and Michael O'Brien, the coachman, with his family living at the time in a house on the land, each testify that they signed the will at the request of Mrs. Green, and the former testifies that Mrs. Green asked them to sign as witnesses, and O'Brien also states that she asked them to sign her will, but he

does not say that she asked them to sign as witnesses. But each testifies that the testatrix read the will at the time and said that it was her will, and Molineaux states, with some variation as to the personal property, that it purported to give plaintiff the New Rochelle land and her personal property, while O'Brien says that it gave the land to plaintiff. Molineaux says that she read it when it was signed and three times thereafter, and follows its history: · Its deposit in a pigeonhole of Mrs. Green's desk, and a year later in a tin box in the desk, where Molineaux afterwards saw it once each week while she was dusting; her own reading of it; her exhibition of it in 1902 to the plaintiff and Miss Quimby when she was staying at the house (the date of which she erroneously fixed in 1905 instead of 1902), who read it; the showing of it to her young children. She further testifies, that, at the time of the examination and burning of Mrs. Green's papers after her death, Green handed her the will and another paper and told her to burn them, which she did after some days by putting the will in the furnace, as she at one time said, or in the range, as she later stated.

The testimony of Molineaux is unfavorably affected by the fact that she said she burned the will at her master's dictation, although her hesitation in doing so showed her consciousness of the wrong of it, and there were discrepancies in her statements and contradictions of her evidence that must be weighed in considering her truthfulness. They are placed methodically before the eye, as in the case of the other witnesses as to the existence of the will, in the helpful brief of the learned counsel for the heirs. But when it is considered that Mrs. Molineaux was an humble and unlearned woman speaking of events dimmed by the lapse of several years, and that there were exacted strict statements by several examiners, some confusion in memory or understanding tending to discrepancies and errors in particulars is not unnatural. As to the existence of the will, her testimony contributes; as to the destruction of it it is the sole evidence; as to the events at its execution, and particularly that she and O'Brien were asked to sign as witnesses, her testimony is vital. Her testimony isolated would beget grave doubt, but it fits with the evidence of the other witnesses and lends probability. O'Brien states less and knows less, which may well be due to lack of opportunity, while the attack upon his veracity is by way of impeaching statements. Some of them were serious. But it is noticeable that even in the alleged impeaching statements he is credited with saying that Mrs. Green called him in and that he signed a paper. The plaintiff's wife read the will on several occasions, as did the plaintiff, and it was in form and substance as Molineaux and O'Brien testified, except as to the personal property and a reference in one instance to all real property.

The plaintiff testified that he first learned from O'Brien, and not from Molineaux, as she states, when he returned from the West some two months after his aunt's death, that the will had been destroyed, and he waited until after his uncle's death in 1908 before he asserted his rights under the will, although he was erroneously allowed to testify to a conversation with Green respecting it. He was willing to

abide by the justice and await the testamentary generosity of his uncle, and his omission to take any heed of what he conceived a right imparts infirmity to his testimony. The effect of such laches as to the bank I will later consider, but the present question is: Does his silence condemn his evidence? It hurts, but in conjunction with all other testimony his evidence has probative value. Mrs. Crosby and Josephine Frost after Mrs. Green's death looked over her accumulated papers while Mr. Green was in and out. The former testified that Mr. Green made inquiry or reference to Mrs. Green's will, and that she found a paper and gave it to him, and that he used an expression indicating that it was the paper he wanted. It was in the course of this clearing away of papers that Molineaux states Green gave her the paper to destroy. The testimony of those witnesses, so far as the examination and destruction of papers is concerned, unites to aid Molineaux's statements of the direction by Green to burn the will. But before the trial Mrs. Crosby wrote to Josephine Frost and sought to call to her attention the finding of an important paper, and the latter replied that the letter revived recollection of the examination and destruction of papers but not the reference to the will, and as a witness she disclaimed all recollection of it. Mrs. Crosby and Miss Frost were engaged in a joint work, and the incident, if it happened, would naturally interest each of them and cling in the memory. Mr. Burns, one of the defendants' lawyers, by telephone conversed with Mrs. Crosby, and she disclaimed any knowledge of the will except that she had heard that there was one. Indeed, she as a witness did not pretend to have any knowledge of it, except she recalled the suggestion and recognition of the paper by Green. That Crosby remembered better than Frost is evidenced by the fact that the latter stated that but for the former's letter the whole matter would have been forgotten; but, even so, the observation of the witnesses while they testified, and consideration of their evidence as parts of the whole, would be needed to solve the fact involved by their contending statements.

With all the accusations brought against the testimony weighed, there is much direct, and, if it be believed, clear, evidence of the existence of the will and of its destruction. There is little, if anything, to oppose it save the alleged inconsistencies of speech and conduct by the witnesses, and so the finding of its execution and destruction is amply supported by the evidence.

[2] But it is urged that the testimony of the plaintiff and his wife, entitled to inchoate rights of dower in the land, that they saw the will, is inadmissible under section 829 of the Code. The reading by any person of a will or deed executed by another is not a communication from the latter to the former. A will is an instrument in substitution for the statute of distribution or descent, or both. If the testatrix lay it down and in her absence another pick it up, the former does not thereby personally communicate with the latter.

[3] There is also evidence of testamentary declarations of Mrs. Green that she had willed her property to the plaintiff. It is urged that this is incompetent to prove the existence of the will. But the ev-

idence was given in rebuttal after the defendants had introduced letters from Mrs. Green to friends referring warmly to some of her kin and making no reference to the plaintiff, and it is urged that such omission shows testamentary disinclination. This seems to make proper the evidence of testamentary inclination. But the evidence relatively has slight force, and may be disregarded without weakening the basis of the finding.

[4] The next inquiry is whether Mrs. Green had any interest in the land which she could devise. This brings the discussion into the complex relations of several of the defendants. Charles H. Green was a man who won the confidence of others and was engaged in many and varied enterprises, and, among others, the manufacture and sale of machines for the reproduction of written or printed matter and some other purposes, which he did through at least two companies, the Hektograph Manufacturing Company and, after its cessation, the Hektograph Company, a defendant. Upon the books of the Hektograph Manufac-. turing Company was carried an account in the name of Wightman, the brother of Lilla A. Green, and after his death in the name of Lilla A. Green until she died in 1905. After the retirement of the first company in 1898, the account was carried on the books of the second company. Thereafter the account was carried on under the head of the "New Rochelle property." Charles H. Green absolutely controlled the companies and owned by far the greater part of the stock of the first company and all of the stock of the second company. The stock of the second company was delivered to and is held by the widow by a claimed gift, although it was willed by Green in trust for the benefit of the widow and others; but I infer that it has little, if any, value. At a time when, so far as appears, he was entirely solvent, a house was purchased in 121st street in the city of New York, and the deed taken in the name of Lilla A. Green. In January, 1893, this house was sold to Seitz, and the sum of $12,250 received as a part of the purchase price. There is no evidence whatever that this money belonged to the Hektograph Manufacturing Company, but checks of the purchaser of the house sold, in the sum of $7,446.69, were on January 16, 1893, credited to the Wightman account.

In 1892 there was bought of one Lathers the land in suit with the house and other buildings for the sum of $43,000. The memorandum of sale does not show the name of the purchaser, but the deed was made to Lilla A. Green. Five hundred dollars was paid down on July 21, 1892, in the form of the company's check, and a mortgage taken back for $42,500. Between July 22, 1892, and October, 1897, on this mortgage $9,888.20 was paid by checks of the Hektograph Manufacturing Company, as well as $4,223.33 for interest thereon, and for insurance and taxes $3,631.28, all of which was charged to the Wightman account. The Wightman account on July 21, 1892, showed a credit balance of $7,509.71, and on January 16, 1893, with the credit of $7,446.69 above mentioned, there was a credit balance of $15,148.-53, which shows that the company was drawing on the account of its creditor. Other money that was used to pay for the land is easily traced. In 1897, the house on the property was burned, and the in-

surance money, $27,222.18, was used towards the mortgage, reducing the same to the sum of $6,900. On October 21, 1897, the Mutual Life Insurance Company made a mortgage loan on the property of $15,000, of which $6,925 was used to discharge the first mortgage; $4,034 was applied to the discharge of a second mortgage made by Mrs. Green to raise money to pay a judgment against Green and the Hektograph Manufacturing Company; $260 to one Alexander; $3,765 by check to Charles H. Green, indorsed by him to the Hektograph Manufacturing Company, which two sums were credited to the account of Lilla A. Green.

I do not find in all this the slightest sign that the Hektograph Manufacturing Company was interested in the land or that it advanced any money to pay for it. Whether the money that went to the credit side of the Wightman account did or did not belong to Lilla A. Green, it did not belong to the company. The Wightman account was closed May 7, 1898, when there was a debit balance of $2,508.77, which by Green's direction Miss Wuesthoff, the bookkeeper, charged off to bills payable, and, while she did not know the reason of it, she testified that no money was passed. There are arguments about the nature of the credit, and the plaintiff makes a showing that the bills were payable to Lilla A. Green and the Wightman debit balance credited thereon. However that may be, Charles H. Green was the president and treasurer, and, if the books were not correctly kept by him, the person making the contention should show it. But there are facts that preclude, in the absence of fraud, any claim in behalf of the company or Green. The Hektograph Manufacturing Company ceased doing business about May, 1898. It was sold on execution June 1, 1898, for $1,773 upon a judgment recovered by one Lipperman (a relative of Green) on June 1, 1898, on a note made to Lilla A. Green and transferred by her. The Wightman account was closed about May 7, 1898. The Hektograph Company, defendant, was not organized until November 24, 1899. There was an account in the name of Lilla A. Green on the books of the Hektograph Manufacturing Company opened January 2, 1897, and closed June 30th by an entry "bills payable, $15,716.67," which would show a note or notes given her; and the first entry of her account on the books of the second company was on March 2, 1900. This was too late to allow the second company to participate in the material events. But on June 1, 1898, Lilla A. Green recovered a judgment against the Hektograph Manufacturing Company for $14,045.03 for moneys loaned and advanced between August 30, 1897, and December 3, 1897, in the sum of $14,764.42, of which an account was rendered to defendant May 3, 1898, showing a balance of $13,977.47, and on the same day a judgment was obtained by her against the company for $1,777.23 on a note made to her. The finding is, and the evidence seems to support it, that these judgments represented the indebtedness of the company to Mr. Wightman and Mrs. Green beyond any expenditure made by it. There would be less difficulty in ascertaining this had the accounts in proper form been presented. As it is, the court is asked to reconstruct the account from items scattered through the record. But it is sufficient that it appears

140 N.Y.S.—27

that, although payments were made by the Hektograph Manufacturing Company, that company was a debtor and not a creditor of Mrs. Green. My attention is not called to any entry that checks of the company were used for the land that was not met by credits to the accounts of Wightman or Mrs. Green. I will later consider the claims of the second company, the Hektograph Company, defendant.

[5] Under the date of January 3, 1903, Lilla A. Green executed a deed with full covenants and delivered the same to her husband; but a grantee was not named in it. In March, 1904, the name "Edward V. Gambier, trustee," was inserted as grantee. Gambier was then the assistant cashier of the Merchants' Exchange National Bank, which held a note made in 1903 by Lilla A. Green to the order of the Hektograph Company and indorsed by it and Charles H. Green. The name of Gambier, trustee, was inserted in the deed, and the deed was accepted by the bank as security for such note and also for a proposed similar note, dated April 26, 1904, and other advances that should be made by the pledgee. These notes were renewed from time to time and other money advanced on similar notes, all for the accommodation of Charles H. Green, who used the avails thereof until the aggregate was $8,300 when Mrs. Green died on November 9, 1905. Thereafter all of the notes made by Lilla A. Green were paid by checks drawn by Charles H. Green, drawn on the account of Charles H. Green, trustee (in fact, the account of Lawton & Co., another firm under which Green did business). This account was credited with the avails of notes made by the Hektograph Company, defendant, and indorsed by Green. In brief, such notes were substituted for her notes; but the loan was the same. In June and July, 1907, two other notes aggregating $1,750, made by the company and indorsed by Charles H. Green and Charles H. Green, trustee, were discounted by the bank, on the faith of the deed, and Green's representations as to ownership. Even after the death of Green the bank discounted a note of the company on which a balance of $440.48 is unpaid. Shall the bank have a lien for any sum? If so, what?

Gambier said that in 1904 Green brought the deed "to us as a basis for a loan, the loan that already existed and for a future one," and in another place he says "future ones," and asked him to allow his name to be used as trustee, and said that "I was to hold that as trustee to secure the payment of those loans, and to sell it in case Mr. Green failed to pay the note," and that the surplus should be paid to him; that the only account Green had was in his name as trustee, as to which Green said he acted as trustee for Lawton & Co., which he owned and controlled for trade purposes; and that the deed was recorded November 13, 1905, but not by reason of Mrs. Green's death, of which he knew. Mr. Lounsbury, president of the bank, testified that before the second loan, and when Green applied for additional money, he told him, "I thought he had about all that he ought to have, unless he had some security satisfactory, or in some way the bank would be secured," and that Green said that he had this property bought with his money, but that the deed was in his wife's name for convenience, and that Green assented to the suggestion that he "give

us a trustee deed." The witness states elsewhere in his examination, "It was to secure any loan made by the bank to Lilla A. Green or Charles H. Green"; but this is not given as a part of any conversation with Green.

It is quite evident that the bank accepted the instrument as security for loans that it had to make, and that as to it the instrument was merely a mortgage, and that it was appropriated to a particular purpose, and that its office was fulfilled with the achievement of that purpose. It will shortly appear that Mrs. Green knew that the deed was to be used to obtain loans, and she was bound by any legitimate use of the deed for the end in view. The plaintiff contends that, as the notes given by her were after her death all taken up by the substitution of other notes, her land was released. But that conclusion has regard only to the form and not the substance of the transaction. The deed was by her sanction given to secure loans of money. The loans continued. The evidences of them were changed in form because Mrs. Green had died and her name could no longer be used on the renewal notes. Had there not been renewals, the land would have been sold unless her devisee had paid the notes made by her. This is a court of equity, and regards the true nature of the transaction rather than its semblance.

[6, 7] But some $1,750 is unpaid of loans made after her death. Lounsbury and Gambier both knew of the death before these loans were made, and the question is whether the bank had notice which should have put them on inquiry before increasing the loans. Green had no real title or interest that would authorize loans to him after his wife's death, unless his wife by her deed allowed him to represent himself as the owner of the land. Any appearance of agency vanished at notice of her death. Had the deed been made to Green and he borrowed on the strength of it, her estate would be bound. But he undertook with Lounsbury to deliver a trust deed as security for loans and advances. That showed title in her transferred to enable loans to be obtained or secured, and it was adapted to that purpose. When the purpose was effected, the grantor was presumably entitled to be reinstated in formal title. But the fact was that the bank relied on Green's statement that he owned the land. He had no real or apparent authority from Mrs. Green to make the representation, and the deed in blank, produced for the single purpose of security and executed in blank and given the fixed nature of a deed to secure loans, apprised the bank that Mrs. Green had not made a conveyance of her entire interest. Hence the bank relied on Green's mere representation, that could be taken as true only to the extent that his wife had executed a deed to be used for loans and not to give Green title. Hence, to justify a lien for the $1,750 advanced after Mrs. Green's death, the bank must show title in Green, or conduct on the part of the plaintiff that estops him from asserting otherwise. I will first consider the latter question.

[8] The plaintiff personally knew of the will and of the evidence to prove it. Some two months after Mrs. Green's death in November, 1905, he was told of its destruction, and he waited until Green died in July, 1908. The bank had been informed by Green that he owned

the property, and, while it was the duty of the bank to make ascertainment after her death, yet there was nothing to be known as to the will. Presumptively there were heirs, and of them inquiry was due before relying on Green's representations aided in any way by the previous transactions. Had the inquiry been directed to Green or the heirs, the inquirer would have been informed that, so far as known, there was no will, for they knew nothing of it and he had caused its destruction. But the plaintiff knew the fact and kept it from publicity and allowed his uncle to possess the land and control it and to borrow further money on the faith of the trust deed. The deed was recorded shortly after Mrs. Green's death and was notice to plaintiff of the trust. And yet plaintiff, with his secret knowledge of the will and its destruction, allowed the bank to continue in the belief that Green owned the property and that it could continue to loan money on it, which it did, to the amount of $1,750 in June and July, 1906. While the bank had no right to make such advancements against Mrs. Green's estate as against the heirs or Mrs. Green's devisee capable of ascertainment by usual inquiry, yet by plaintiff's concealment the devisee could not be ascertained by ordinary inquiry from sources where the knowledge would expectably reside. Therefore the plaintiff has been guilty of such laches as to the bank that it should have a lien for all sums advanced to Green.

It is convenient in this connection to consider whether money advanced to Green through Gambier should not also be paid by the same reasoning. I think not. The deed was not made to secure such money, but such loans were made at different times in 1908 by outside parties who became interested in one of Green's machines. The loans are not related to the trust deed save through the instrument executed by Green in 1910, which will be later discussed. Hence as to such loans the doctrine of laches does not apply.

[9] But I will now continue the discussion whether Green or his first company did own the land, and whether the deed was executed to effectuate a trust under which his wife held it. As above stated, the history of the purchase of and payment for the land does not show that either owned it. On July 6, 1897, he testified that he owned "no real estate nor any interest in any anywhere. * * * My wife owns real estate and personal property. I did not furnish any of the money to my wife to purchase such real estate and personal property." Indeed, the record shows that he did not, but it does show that when the land in question was bought he was indebted to none of the appellants. I have no doubt from the evidence that in his many ventures he was in frequent financial peril. The judgments at times recovered against him illustrate his business vicissitudes. It was prudent that the wife should have the family residence; but, in the absence of fraud, we regard the fact and not the motive, and the fact is that it is not known that his money or the money of his company was used for its purchase or maintenance, while the history shows that money credited to Mrs. Green or her brother was used. But it is also contended that the trust deed, and the events that accompanied its execution and followed the same, prove that the Hektograph Company

(second company) owned it. To aid this contention, Mr. Salter's testimony is used. He testified that he went to the house to take Mrs. Green's acknowledgment to the deed, and that Mr. Green said to his wife:

" 'You know, this is the property that I put in your name of the company, and I have made an arrangement to borrow some money for the company, and I have had it done by having this deed, the same as I told you about yesterday.' He said to her, some person, I can't recollect the name, connected with the bank, was going to loan the money, he had made arrangements, or expected to, and wanted this deed. She said: 'Very well; all right. All right; I know all about it; I will sign it.' "

I think it is made very clear that the deed was executed for the single purpose of obtaining money at the bank, and not for the purpose of divesting herself of title save as that purpose required, and in any case not to vest the title in Green, or in the Hektograph Company. Without impugning Mr. Salter's good faith, it should be observed that the Hektograph Manufacturing Company was not in existence; that the Hektograph Company, the name mentioned by Mr. Salter, was not in existence until after the land was bought and paid for, and does not pretend to own it by original purchase; that Mr. Salter was in fact the real attorney through whom Mrs. Green recovered the two judgments against the Hektograph Manufacturing Company in 1898; that he was similarly related to the judgment recovered by Lepperman on a note given to Mrs. Green on which the company was sold; and that he conducted the examination of Green in supplementary proceedings. Under such circumstances, Mr. Salter could hardly have understood that Mrs. Green meant to acknowledge by what she said or did not say that the practically extinct Hektograph Manufacturing Company, so largely her debtor, owned the land, or that she was executing a deed in furtherance of a trust wherein it was the beneficiary. There is no foundation for the inference that she was executing the deed to her husband, as nothing in that regard was mentioned, and, so far from that being in contemplation, he signed the deed as a witness. Mr. Salter makes it very clear that money was engaged or expected from the bank, and that the deed was made to secure it. This fits the testimony of Lounsbury and Gambier as to the object of the deed, while the reference to the company as the owner of the land disputes Green's statements to Lounsbury that he owned it.

We come now to some events after Mrs. Green's death on November 9, 1905. On November 16, 1905, Green wrote Gambier that, whereas he held in trust the land "to secure to the Merchants' Exchange National Bank the payment of certain promissory notes amounting in all to $8,300, or thereabouts, with the understanding * * * that when said notes are liquidated a deed of the property shall be executed by you and delivered to any party, or parties, named by me. I hereby authorize and direct you, on the payment of said obligations, * * * to execute and deliver a deed for said property to the Hektograph Company," etc. On November 22, 1906, Green wrote Lounsbury that the property was purchased originally with his money and conveyed to his wife for convenience, and that it was con-

veyed to Gambier as security for certain notes discounted and "is now held as collateral for notes amounting to $8,300, and I leave it with the bank as collateral for any advances now made or to be made by said bank." On May 30, 1908, Green and Louise B. Green executed an instrument assigning to Gambier all their interest in the land to hold him harmless for loans to Green for a sum not exceeding $16,-500 without prejudice to the interest of the bank, and continues, "Any equity remaining in the property after the satisfaction of the claims of" the bank and Gambier to revert to the Hektograph Company. The name Charles H. Green appears where the company's name is, but is crossed out.

These three papers, in connection with explanatory evidence, show: (1) That Green after his wife's death claimed that the property was his own and not the property of the Hektograph Company; (2) that it was held as security for $8,300 in loans to him; (3) that he was pledging it for an additional amount to the bank; (4) that he was assuring Gambier payments for certain moneys paid by or through him and disconnected with the bank or the purpose for which the deed was given to the bank. Green's assertion of title or interest did not give him any, and, even if it could have any force, it disputes his oath in supplementary proceedings. But it is upon the letter in 1905 and assignment to Gambier in 1908, as well as Green's alleged ownership, that the Hektograph Company base their claims for liens on the land, and on all three papers the bank to a degree relies. But Green had no title; he contributed nothing to the purchase price; neither did either company; his assertion of payment and ownership are incompetent to prove the same and dispute his previous oath; his attempt was to divert the deed from the object of its creation; and he had nothing to convey to Gambier or to direct to be conveyed to the company. It is not necessary to consider whether Mrs. Green was indebted to the second company. Even so, it has no lien on the land under the deed.

[10] This brings the inquiry to the suggestion that the plaintiff may not maintain this action because Lilla A. Green had no interest to devise, and that her right, if any, was a mere chose in action, or personal property, which went to her executor, who is not made a party, and, moreover, that the lost or destroyed will of personal property cannot be established for the purpose of basing the right to relief in an action in equity. The basis of the argument is that Lilla A. Green made a grant in trust and there was no legal or equitable title left in her. But it has been ascertained that Lilla A. Green did not make a deed in trust, but rather made a deed to operate as a mortgage wherein the grantee's name should be inserted. It does not cease to be a mortgage because the mortgagee holds the mortgage in trust for others. So I think the very careful and interesting argument in this regard fails.

[11] There are many suggestions and considerations that have received attention that cannot be here discussed in what must be a general presentation. It remains to consider some exceptions and the question of costs. I have already considered the objection that the plaintiff could not testify to the contents of the will under section 829

of the Code of Civil Procedure. This objection was raised, and later without specific objection the plaintiff testified that Charles H. Green showed him the will in 1901. Later the objection to his stating the contents of the will was renewed. But at a later period under objection and exception he was allowed to repeat his evidence that Mr. Green showed the will to him, and was also permitted to testify under objection and exception that Green said:

"I want you to see this will of your Auntie's and to know that you have been taken care of for life, and I want you to stay in New York with me."

A motion to strike out this evidence was reserved and denied. The evidence is clearly inadmissible as to parties who represent or claim under Charles H. Green, inasmuch as Green's statement, if it was made, is an acknowledgment not only that his wife had devised the property, but that she had a right to do so against him or his company. The heirs do not raise the question on appeal, but it is presented in a supplemental brief by Gambier in his several capacities, and the bank.

[12, 13] Inasmuch as the bank under the proposed modification of the judgment receives its entire demand, the evidence is immaterial. But I think, also, it should be disregarded as to Gambier, inasmuch as competent evidence shows without serious contradiction that Charles H. Green testified truly when he said that he did not own any land, but that his wife did, and that he had contributed nothing to the payment of it. The other exceptions have been considered, but do not require discussion.

[14] The court had the power to make the allowance of costs to the bank. It is true that the bank did not ask for affirmative relief, but the relief asked by the complaint involved the ascertainment of the amount due on the bank's mortgage, and the plaintiff has been defeated in his effort to show that there is no lien. The court also had power to make the allowance to the general guardian under section 3253 of the Code of Civil Procedure.

The judgment should be modified by decreeing a lien in favor of the bank for the sum already allowed and the additional sum of $1,750 with interest, and as so modified affirmed, with costs against all of the appellants except the bank and the guardian ad litem. All concur.